**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0665-23

N.T.,[1]

    Plaintiff-Appellant,

v.

C.T.,

    Defendant-Respondent.

_____

Argued December 11, 2024 – Remanded December 30, 2024
Resubmitted February 24, 2025 – Decided April 16, 2025

Before Judges Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0909-20.

N.T., appellant, argued the cause pro se (Thomas J. DeCataldo and Andrew J. Rhein, on the brief).

---

[1] To protect confidentiality, given our discussion of mental health diagnoses and allegations of domestic violence, we use initials and general party designations and refrain from using the minor child's name pursuant to Rule 1:38-3(a)(2) and (d)(10).

Respondent has not filed a brief.

PER CURIAM

In this post-judgment matrimonial matter concerning custody and parenting time for the parties' young child, plaintiff appeals from the family court's September 18, 2023 order (1) suspending the parties' prior agreement to mediate and arbitrate post-divorce disputes and (2) continuing its prior orders suspending indefinitely plaintiff's custody and parenting time. Plaintiff contends the trial court lacked jurisdiction to continue to rule substantively on custody and parenting time restrictions given the parties' agreement, which was intended to control all post-judgment disputes regarding the child. He further asserts the court erred in restricting his custody and parenting time without first conducting a plenary hearing.[2]

Having reviewed plaintiff's contentions in light of applicable legal principles, we affirm the family court's exercise of jurisdiction and its temporary

---

[2] Plaintiff filed this appeal on November 1, 2023, and days prior to oral argument in December 2024, we received a consent order filed with the family court on November 22, 2024, executed by both parties, indicating plaintiff relinquished his custody and parenting time rights to the minor child. After oral argument, we retained jurisdiction but remanded to the family court to clarify the consent order's impact on this appeal. The trial court advised that the consent order was vacated on January 6, 2025.

A-0665-23

suspension of the parties' arbitration agreement, but we remand for further proceedings to consider further the issues of custody and parenting time.

## I.

## A.

Plaintiff, a physician, and defendant, a psychologist, were married in 2005 and divorced in 2021. Their one child—a daughter—was born in 2012. Plaintiff filed for divorce in 2020 after defendant advised she wanted to end the marriage and obtained a series of domestic violence temporary restraining orders against plaintiff. Defendant described plaintiff's erratic behavior that led to plaintiff's psychiatric hospitalization and resulted in his termination from employment. Defendant alleged both physical and emotional abuse. The parties ultimately entered into a consent order for civil restraints, requiring plaintiff to undergo a psychiatric evaluation and restricting him to supervised parenting time.

The parties entered into a Marital Settlement Agreement (MSA) that was incorporated into their Dual Judgment of Divorce entered on June 1, 2021. The parties agreed to joint legal custody, with defendant designated the parent of primary residence; and plaintiff being "afforded reasonable parenting time as agreed upon by [the parties], not to exceed four . . . weekends per month." They agreed they would "maximize [their child's] emotional and physical well-

3

being . . . and afford her a sense of security and the affection of both parents" and neither would "directly or indirectly" alienate the child from the other. The MSA incorporated the civil restraints.

In January 2022, the parties entered into a subsequent consent order replacing their prior civil restraints agreement but memorializing their obligation to refrain from engaging in harassing or abusive behavior. The consent order also contained the following alternative dispute resolution (ADR) provision:

> In the event the parties have a disagreement around the terms of their [MSA] or subsequent post-[j]udgment issues, they agree to first use a therapist . . . . If they cannot come to an agreement within one . . . month, the parties agree to use a mediator agreed upon by both parties. If they cannot reach [an] agreement within two . . . months, they shall proceed to binding arbitration.

The consent order provided plaintiff with five additional parenting days between February and April but left open the permanency of plaintiff's parenting-time schedule. The order further required the parties to agree on a detailed parenting time schedule by November 1, 2022.

However, even after the parties secured a parenting coordinator and co-parenting therapist "to assist the parties in implementing their parenting plan," their discord continued. Defendant claimed that plaintiff continuously engaged

4

in conduct violating their prior agreements and court orders, citing instances of plaintiff's involving the child in the details of the litigation and sending harassing communications to defendant, her attorney, her friends, and the parenting coordinator. On the eve of defendant's remarriage in November 2022, plaintiff drafted and physically delivered to defendant's home, accompanied by the child, a letter, signed by the child, alleging, among other disparaging claims, defendant and her now-husband had an extra-marital affair before the parties were divorced.

B.

We provide the following brief chronology of the pertinent post-judgment decisions challenged by plaintiff.

Orders to Show Cause Regarding Custody and Parenting Time

After plaintiff's delivery of the letter and what defendant perceived to be concerning behavior including threats to her new husband and others involving and posing risk to her daughter, defendant filed an Order to Show Cause (OTSC) on December 9, 2022, asking the family court to: suspend plaintiff's parenting time for their then-ten-year-old daughter; compel plaintiff to undergo a psychological evaluation; compel plaintiff's payment of defendant's counsel fees; and refer plaintiff to the prosecutor's office for alleged harassment of

defendant's counsel in violation of prior consent orders agreeing to refrain from contact.

Defendant expressed fear that without court intervention, plaintiff's "inappropriate and dangerous outbursts" and "mental, emotional[,] and physical abuse" of the child "will escalate" and cause "irreparable harm." Defendant provided examples and attached exhibits showing plaintiff, undeterred by orders requiring him to refrain from harassment, continued to send "ranting[]" correspondence to defendant and others about defendant and this matter. Defendant reported the child's claim that plaintiff told her to choose between plaintiff and defendant's husband, and when she refused, he "threw a backpack at her," telling her to "pack her bags and leave."

The same day, the court entered an order suspending plaintiff's parenting time "until further [o]rder of the [c]ourt," and scheduled a return date on December 21, 2022.

Plaintiff responded by filing a separate OTSC, seeking reconsideration of the parenting time restraint in light of what he claimed were favorable recommendations by the parties' parenting coordinator. Plaintiff also objected to defendant's OTSC as bypassing the parties' ADR agreement. The court denied plaintiff's OTSC, simultaneously granting defendant's request to prohibit

6

plaintiff from contacting her, her husband, or the child pending the December 21, 2022 return date for defendant's OTSC. Plaintiff also responded to defendant's original OTSC, seeking that the court refer the matter to mediation per the parties' January 2022 consent order and remove the newly imposed restraints and restrictions on his parenting time.

The parties submitted conflicting interpretations of the recommendations of parenting coordinator Linda Schofel, Esq., LCSW. Specifically, plaintiff submitted an email from the coordinator, clarifying that she had not recommended suspension of plaintiff's parenting time principally because she had not "received any communication" from the parties' daughter expressing fear or reluctance to see her father. Ms. Schofel added, however, that she previously expressed concerns about plaintiff's behavior, and added her concerns heightened around the time of defendant's wedding.

The judge[3] temporarily suspended plaintiff's prior parenting time arrangement, but restored daily FaceTime contact, and provided two specific days of supervised in-person visitation, again ordering that the parties refrain from discussing the litigation with the child. The judge emphasized that

---

[3] Other than the December 21, 2022 proceeding, all prior and subsequent proceedings were conducted by the family court judge who originally suspended defendant's parenting time on December 9, 2022.

A-0665-23

parenting time would not be suspended indefinitely and ordered plaintiff to submit to an evaluation at his own expense,[4] to assist in determining the appropriate parenting time moving forward. The parties subsequently agreed by consent order that Dr. David Gomberg, Ph.D., would conduct a psychological evaluation and risk assessment. However, Dr. Gomberg notified the court that he received "a barrage of emails" from plaintiff questioning the doctor and the process causing the doctor to conclude he could not serve as the evaluator.

The judge rejected plaintiff's challenge to the court's jurisdiction, invoking its obligation, particularly in emergent circumstances, to "put the children first," and adding, "there's no contract that's going to stop that."

Plaintiff then filed an OTSC in March 2023, seeking the restoration of his parenting time and allowing him to choose the mental health provider to conduct his court-ordered evaluation. Defendant countered that plaintiff did not attend the evaluation with Dr. Gomberg and defied past court orders requiring his compliance. The court denied the March OTSC designating it as "non-emergent" and noting plaintiff "is already receiving parenting time with [the child]."

---

[4] We denied plaintiff's application for emergent relief, noting that some parenting time had been restored and plaintiff could "file a new application with the trial court to schedule further parenting time . . . after December 30."

A-0665-23

The court held a conference the following month at plaintiff's request to consider, among other questions, the recurring issue of whether these matters should be referred to mediation and arbitration to address the restricted parenting time. Defendant asserted that plaintiff continued to display "frightening," "dangerous," and "unpredictable" behavior, toward her and others including emails to providers, third parties, and now the court, and opposed proceeding with any ADR process until an evaluation was completed.

The court acknowledged that plaintiff had contacted the court directly, and offered a gift, and admonished plaintiff against such ex parte contact. The court addressed plaintiff's concern that no prospective parenting time schedule had been set, despite allowing for supervised parenting time. The court indicated it "was not aware of that" and directed the parties to "confer to rectify that situation" and file a motion if unable to agree. The court explained that it had not scheduled a plenary hearing as it was awaiting plaintiff's completing his evaluation, but noted plaintiff was "responsible for that situation."

Regarding the parties' ADR agreement, the court explained:

> [L]et me be clear. The fact that . . . I perceive a danger to this child based on [plaintiff's] actions means that the actions that the [c]ourt has taken trump any issue of mediation or arbitration or parent coordination. As I indicated before, I believe that he is entitled to a plenary hearing after there's been a proper psychological

> evaluation to be performed in accordance with this [c]ourt's order. Maybe he's entitled to mediation under the mediation provision after there's been a . . . psychological evaluation . . . .

The court clarified that unless the parties agreed after the completed evaluation that mediation or arbitration would be appropriate, the court would "decide that issue by way of a motion." The court stated that it viewed plaintiff as a "disturbed person" and remained concerned about expanding time with the child. The court found, given plaintiff's "frightening [and] disturbing conduct," it was not appropriate to enlist the parent coordinator to resolve these custody issues at that juncture.

Contempt Finding and Incarceration

On June 15, 2023, defendant filed another OTSC, seeking among other relief that the court suspend entirely plaintiff's parenting time and hold plaintiff "in contempt of [c]ourt" for numerous violations of court orders and "immediate[ly] incarcerat[e]" him. Defendant alleged plaintiff posed a threat of imminent harm to the child by defying the standing order that he have only supervised visitation. Defendant cited plaintiff showing up places unannounced, including to the child's sporting event intending to participate in it. Defendant reported that plaintiff violated prior orders by showing up at her home, contacting the court, pledging he would continue to inform their daughter about

A-0665-23

the litigation, and continuing to harass defendant's counsel. The court granted initial relief suspending plaintiff's parenting time pending the return date.

On June 26, 2023, the family court conducted a hearing, first stating it was considering detaining plaintiff "pending the hearing before [a specific criminal judge] or other . . . court and to order a psychiatric evaluation of him." It then heard testimony regarding plaintiff's alleged non-compliance with court orders and his appearances at and communications with defendant's counsel's office and found defendant "in contempt of [multiple] [c]ourt[] orders."

The court rendered a decision to incarcerate plaintiff:

> I find probable cause that [plaintiff] has engaged in contempt of the [c]ourt's orders. I find that he has repeatedly violated court orders in such a manner that is contrary to the best interest[s] of the parties' child. I find that he certainly appears to me to be a danger to others, possibly himself. I know he's been . . . psychiatrically hospitalized . . . for concerns of suicidal ideation.
>
> . . . [W]hen [defendant's counsel] call[ed] his conduct disturbing, that is an understatement. It's very frightening to me.
>
> So I am going to incarcerate him now. . . .
>
> I am going to order a psychiatric evaluation.
>
> He's incarcerated until further court order. He will appear before another judge . . . in connection with this contempt proceeding.

A-0665-23

In the accompanying order the court: found probable cause; ordered incarceration; and citing to criminal competency statutes, N.J.S.A. 2C:4-4, -5, directed a competency evaluation by Ann Klein Forensic Center, setting the return for a case conference in forty-five days.

On July 5, 2023, plaintiff filed an OTSC seeking his release from incarceration and appointment of a private expert to fulfill the psychological examination requirement in the June 26 order. By order of July 11, the court granted, in part, plaintiff's application, and ordered defendant's appearance to "show cause as to why an order granting plaintiff's request to engage [his private expert] Dr. Gianni Pirelli to conduct the psychological evaluation ordered [on] . . . June 26, 2023 . . . should not be granted."

At the July 21, 2023 hearing, plaintiff's criminal counsel was present, as was an assistant prosecutor, in addition to counsel in the family matter. The court heard arguments and considered the July 15, 2023 report of Dr. Mathias R. Hagovsky, Ph.D., who had conducted a risk assessment, after multiple interviews with plaintiff and defendant.

Dr. Hagovsky concluded that plaintiff's risk level was "[m]oderate to [h]igh," explaining plaintiff's "[p]rior history of depression, mania, thought disorder, and acting out . . . represent[ed] impaired judgment, [and] difficulty

12

accepting/maintaining proper boundaries with individuals" like defendant and his daughter, and the judiciary. He found plaintiff's efforts "to preserve his relationship with his daughter" have "preserved, enhanced, [but also] negatively affected" that relationship. In his report, the doctor opined that plaintiff "dedicated himself to destroying any person or process that would interfere with his efforts" to preserve his relationship with the parties' daughter. The doctor suggested "[m]itigating factors . . . to reduce the level of risk," including engagement with regular psychiatric consultation and individual therapy.

After arguments, the court ordered plaintiff's release indicating it did not believe it had the authority to detain plaintiff without a criminal contempt charge, but continued the suspension of parenting time.

September 2023 Motion Order Suspending Arbitration

Shortly after plaintiff's release, defendant filed a notice of cross-motion[5] seeking along with other relief the "vacati[on] of Paragraph 13 of the January 31, 2022 consent order as it pertains to the use of alternate forms of dispute resolution." Plaintiff responded asserting "[a]ny emergent circumstances that may have previously existed have now abated," and because this was the basis

---

[5] Plaintiff's counsel had filed a motion seeking to be relieved as counsel which was pending throughout the contempt proceedings in response to which defendant filed this "cross-motion."

upon which the court initially exercised jurisdiction to suspend plaintiff's parenting time in December 2022, "the matter [wa]s now ripe for mediation, discovery, and a plenary hearing to be held if necessary in arbitration." Plaintiff further claimed defendant's application was untimely under Rule 4:50-2, for failure to raise the issue in prior proceedings.

On September 15, the court heard arguments. Defendant's counsel recounted plaintiff's history of non-compliant, obstreperous, and harassing behavior, and claimed plaintiff had proven himself incapable of mediating, cooperating with a parenting coordinator, or arbitrating disputes.

Plaintiff's counsel agreed that back in December 2022, the situation allowed for the court to exercise jurisdiction to "triage an emergency," but argued that now the court should transfer the matter under the ADR agreement to allow for the process agreed upon by the parties. Plaintiff also argued that the next step for the court or the arbitrator would be to conduct a plenary hearing regarding custody and parenting time and asserted that an arbitrator would be equally equipped to conduct the necessary hearing.

The court found, as it had in the past, that plaintiff's behavior continued to be of concern, and stated it was "confident" that it had the "jurisdiction and . . . responsibility to protect children." The court reiterated its view that

plaintiff "engaged in . . . frightening behavior." It concurred that an arbitrator "can do just as good a job as" a court at dispute resolution, but emphasized again it must be satisfied that the child is safe and secure in that alternative process. The court stated, "[s]uch agreements between parents about children are enforceable only in equity and they are subject to the [c]ourt's power to exercise continued supervisory control."

Accordingly, the court suspended the ADR provisions of the parties' January 2022 consent agreement. It clarified that it was "suspend[ing] enforcement of that order, until a time that . . . [it was] satisfied that . . . there's little enough risk to the parties' child, principally, that that's an appropriate way to proceed, mediation, arbitration, ADR." It found that plaintiff's behavior, emblematic of his "dedicat[ing] himself to destroying any person or process that would interfere with his efforts to be with his child," rendered the case unsuitable at that juncture for mediation and arbitration.

The court then acknowledged plaintiff is "entitled to a hearing at some point, absolutely." Citing to administrative delays in conducting trials, the court encouraged plaintiff "to be compliant with his medication and his treatment, [and] demonstrate by his behavior that he's not a risk to himself, his daughter, or anyone else" and then "he c[ould] start seeing his daughter again."

A-0665-23

Plaintiff filed this appeal on November 1, 2023.

II.

On appeal, plaintiff argues: (1) all of the court's orders after December 9, 2022 should be vacated as the court lacked jurisdiction and was required to refer these post-judgment issues to binding arbitration;[6] (2) the court improperly deprived plaintiff of a plenary hearing before suspending indefinitely his parenting time; (3) the court erred in sua sponte, de facto suspending his joint legal custody by suspending use of the parenting coordinator; (4) the court failed throughout the motion proceedings to fashion a path to restoration of his parenting time by creating benchmarks; (5) the court improperly incarcerated plaintiff without any legal justification or possibility of release; and (6) if remanded and not referred to arbitration, the case must be removed from Somerset County or transferred to a new judge if it remains in that vicinage.

---

[6] Plaintiff also contends that defendant's September 2023 application to suspend the prior agreement was time-barred under Rule 4:50-1, as not filed within a reasonable time, as required by Rule 4:50-2. Plaintiff raised the claim in his motion submission, but not before the family court; nor did the court decide the issue. Nevertheless, we are satisfied that defendant both explicitly and implicitly sought to suspend the ADR agreement from the outset of this motion practice in December 2022. As such, we conclude plaintiff's procedural challenge lacks merit.

A-0665-23

III.

It is well-settled that the scope of our review of Family Part orders is limited. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). We afford substantial deference to the Family Part's findings of fact based on adequate, substantial and credible evidence in the record, understanding the court's special expertise in family matters. Id. at 412-13; see MacKinnon v. MacKinnon, 191 N.J. 240, 253-54 (2007). Jurisdictional issues are matters of law which this court considers de novo. See Mastondrea v. Occidental Hotels Mgmt. S.A., 391 N.J. Super. 261, 268 (App. Div. 2007).

No special deference is accorded to the judge's legal conclusions. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). However, we recognize

> we "should not disturb the factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice" or when we determine the court has palpably abused its discretion.
>
> [Parish v. Parish, 412 N.J. Super. 39, 47 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412).]

A.

We first address plaintiff's challenge to the family court's jurisdiction and

17

decision to suspend the parties' ADR agreement  We review the controlling legal principles.

"New Jersey has long espoused a policy favoring the use of consensual agreements to resolve marital controversies."  Konzelman v. Konzelman, 158 N.J. 185, 193 (1999).  "Voluntary agreements that address and reconcile conflicting interests of divorcing parties support our 'strong public policy favoring stability of arrangements' in matrimonial matters."  Ibid. (quoting Smith v. Smith, 72 N.J. 350, 360 (1977)).  "[F]air agreements arrived at by mutual consent 'should not be unnecessarily or lightly disturbed.'"  Edgerton v. Edgerton, 203 N.J. Super. 160, 171 (App. Div. 1985) (quoting Smith, 72 N.J. at 358).

Similarly, parents have the right "to choose the forum in which their disputes over child custody and rearing will be resolved, including arbitration."  Fawzy v. Fawzy, 199 N.J. 456, 461-62 (2009).  This entitlement derives from the well-settled deference granted to parental autonomy to raise their children, that, while sweeping and weighty, "is not absolute."  Id. at 474 (quoting V.C. v. M.J.B., 163 N.J. 200, 218 (2000)).

"Indeed, the [S]tate has an obligation, under the parens patriae doctrine, to intervene where it is necessary to prevent harm to a child."  Id. at 474-75.

18

The court's responsibility to protect the health and welfare of children extends to "both physical and emotional harm." Segal v. Lynch, 413 N.J. Super. 171, 188 (App. Div. 2010). Our Supreme Court has held, "[w]hen no harm threatens a child's welfare, the State lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit. However, when harm is proved and the presumption in favor of a fit parent's decision making is overcome," courts are empowered to intervene to secure the "child's best interests." Fawzy, 199 N.J. at 475-76 (quoting Moriarty v. Bradt, 177 N.J. 84, 115 (2003)). This is particularly so in custody disputes. See In re Adoption of a Child by W.P., 163 N.J. 158, 195 (2000) ("In New Jersey, pursuant to their equity and parens patriae jurisdiction, family courts routinely decide issues of custody, visitation, child support, and myriad other aspects of domestic relations that affect parents' authority to raise their children without interference from the [S]tate.").

The Supreme Court in Fawzy instructed, "where no harm to the child is threatened, there is no justification for the infringement on the parents' choice to be bound by the arbitrator's decision." 199 N.J. at 478 (recognizing this principle in assessing whether the arbitrator's determination was in the best interests of the child). Importantly, however, the Court has clarified, "where

19

harm is claimed and a prima facie case advanced, the court must determine the harm issue" and "[i]f there is a finding of harm, the presumption in favor of the parents' choice of arbitration will be overcome and it will fall to the court to decide what is in the child's best interests." Id. at 478-79.

Here, defendant did not dispute the validity of the parties' ADR agreement. Likewise, the family court did not, in its September 2023 decision or at any point prior to that, question the legality or enforceability of the ADR provision, the parties' right to agree to ADR, or an arbitrator's "theoretical" jurisdiction or suitability to address custody disputes. Instead, invoking its well-settled authority to intervene in child custody matters, the court considered whether judicial intervention was necessary to protect the best interests of the child.

We perceive no error in the family court's concluding it had the authority to consider whether to exercise its parens patriae authority to temporarily suspend the parties' ADR agreement. Indeed, plaintiff's counsel agreed the court properly interceded to "triage" the situation initially in December 2022.

Even as it suspended the ADR provisions in September 2023, the trial court did not foreclose the restoration of the parties' mediation and arbitration process when the risk was abated. The court did not assume jurisdiction

20

permanently nor did it vacate or suspend the parties' prior agreement with finality. We therefore must determine only whether the court abused its discretion in finding plaintiff's behavior so concerning as to risk harm sufficient to warrant the temporary suspension of the ADR process in the best interests of the child.

From the initial granting of defendant's OTSC in December 2022, the court indicated it was intervening to address the emergent situation caused by plaintiff's concerning conduct, directly involving and threatening the emotional welfare of the child, particularly around the time of defendant's remarriage. The court restricted plaintiff's unsupervised parenting time, subject to further order of the court, and ordered plaintiff to undergo a psychological evaluation. Plaintiff did not comply with the order.

The record is replete with consistent and escalating examples of plaintiff's alarming conduct and communications with defendant, her counsel, the providers, the court, and most importantly the child. Also pervading the record are instances in which the family court communicated clearly that it would consider lifting the parenting time restrictions and returning the matter to mediation and parenting coordination if plaintiff conformed his conduct, obtained the evaluation, and adhered to the court's orders. Plaintiff remained

non-compliant.

By September 2023, the court had the benefit of Dr. Hagovsky's risk assessment in which he characterized "[plaintiff's] thinking [as] convoluted, unreasonable, and even bizarre," adding plaintiff "did not anticipate or appear concerned about the potential negative consequences to him and/or his daughter." The court relied upon this risk assessment to conclude mediation, parenting coordination, and arbitration were not safe or productive alternatives. Thus, we discern no abuse of discretion in the court's determinations that were grounded in the record and will not disturb the court's decision, acting under its parens patriae authority, to compel an evaluation of plaintiff before referring the matter to other modes of dispute resolution despite the prior agreement.

Mindful of the protection afforded parental rights, as well as the right of parents to select the forum for determination of child custody matters, on this record, we nonetheless perceive no error in the court's exercise of its supervisory obligation to protect the best interests of the child and retaining jurisdiction until such time it deems plaintiff capable of participating in the agreed-upon ADR process. Plaintiff's prior alarming behavior in dealing with defendant, the court and counsel, providers, and their child was directly tethered to the safety of the child. We are satisfied the court reasonably found a risk of harm to the child

inherent in transferring the matter for what would most certainly be contentious and virtually futile ADR and appropriately suspended the ADR agreement.

B.

Next, we turn to plaintiff's claim that the court erred in restricting and later suspending his parenting time without a plenary hearing, and request that we reverse the court's prior orders and remand for a plenary hearing. Importantly, before reviewing the well-settled applicable law, we note the family court acknowledged consistently plaintiff's right to a plenary hearing. Thus, there is no disagreement that disputed custody and parenting time matters in alleged changed circumstances such as this require a hearing.

"A party seeking to modify custody [or parenting time] must demonstrate changed circumstances that affect the welfare of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007). "Where there is already a judgment or an agreement affecting [parenting time] in place, it is presumed it 'embodies a best interests determination' and should be modified only where there is a 'showing [of] changed circumstances which would affect the welfare of the children.'" A.J. v. R.J., 461 N.J. Super. 173, 182 (App. Div. 2019) (second alteration in original) (quoting Todd v. Sheridan, 268 N.J. Super. 387, 398 (App. Div. 1993)). An evaluation of changed circumstances consists of assessing the

23

circumstances around the time prior to the entry of a parenting time order.  See Donnelly v. Donnelly, 405 N.J. Super. 117, 127-28 (App. Div. 2009).

A court may resolve genuine issues of material fact as to the existence of changed circumstances through a plenary hearing.  See Hand, 391 N.J. Super. at 105.  "A plenary hearing is required when the submissions show there is a genuine and substantial factual dispute regarding the welfare of the child[], and the trial judge determines that a plenary hearing is necessary to resolve the factual dispute."  Ibid.; see Lepis v. Lepis, 83 N.J. 139, 159 (1980); see also R. 5:8-6.  "In some cases, there is clearly a need for an evidentiary hearing to resolve custody or parenting time issues."  Hand, 391 N.J. Super. at 105.

As we have stated, we are satisfied the court found an emergent need to restrict and temporarily suspend plaintiff's parenting time, but throughout the proceedings anticipated conducting a plenary hearing.  The court ordered an evaluation and made clear it would schedule the proceedings upon the evaluation's completion.  In these unique circumstances, largely of plaintiff's creation due to non-compliance, the delay was not unreasonable.

We therefore remand for further proceedings, recognizing that much may have changed in the year-and-a-half since the court's last decision.  We leave to the court's discretion to determine the impact, if any, of changed circumstances

24

on the court's existing suspension of the parties' prior ADR agreement.

## C.

To the extent plaintiff has raised additional issues, we consider them either moot, see Redd v. Bowman, 223 N.J. 87, 104 (2015) ("An issue is 'moot when [the court's] decision sought in a matter, when rendered, can have no practical effect on the existing controversy.'" (quoting Deutsche Bank Nat'l Tr. Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011))), or lacking merit to warrant further discussion in a written decision, see R. 2:11-3(e)(1)(E). We briefly offer the following guidance regarding plaintiff's claim that the court improperly incarcerated him without process for review or release.

Although the matter is now moot, as plaintiff was released in July 2023, we express our agreement with the family court's own later recognition that it lacked any authority to engage in pretrial detention proceedings when there was no criminal complaint warrant pending. The court perhaps utilized incarceration to allow for expedited evaluation of plaintiff finding he presented a risk, but the criminal competency process was not an available alternative and detention was inappropriate.

Addressing plaintiff's final request that we remand this matter to a different judge, although this court possesses "the authority to direct that a case

be assigned to a new judge upon remand," we exercise this power "sparingly." Graziano v. Grant, 326 N.J. Super. 328, 349-50 (App. Div. 1999). "That power may be exercised when there is a concern that the trial judge has a potential commitment to his or her prior findings." Id. at 349. We do not have that concern here, even on this tumultuous record with prior rulings adverse to plaintiff, as the family court indicated the temporary nature of its rulings and its willingness to restore parenting time should plaintiff commit himself to compliance with court orders and therapeutic direction. See Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008) ("Bias cannot be inferred from adverse rulings against a party." (citing Matthews v. Deane, 196 N.J. Super. 441, 444-47, (Ch. Div.1984))).

We further note that "an application for disqualification pursuant to [Rule] 1:12-1 should initially be made to the motion judge." Graziano, 326 N.J. Super. at 50; see Bonnet v. Stewart, 155 N.J. Super. 326, 330 (App. Div. 1978) (determining "the issue [wa]s inappropriately raised on . . . appeal because [the] plaintiff never moved to challenge the judge himself, as would have been the proper practice").

Affirmed in part, and remanded for proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division